**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| LIGHTHOUSE RESOURCES INC., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 20-13056 (CTG) |
| | ) | |
| | ) | |
| LIGHTHOUSE RESOURCES INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ATLANTIC SPECIALTY INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | Adv. Proc. No. 24-50144 (CTG) |
| Defendant. | ) | |

<u>**ATLANTIC SPECIALTY INSURANCE COMPANY'S RESPONSE BRIEF IN OPPOSITION TO LIGHTHOUSE RESOURCES INC.'S MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY**</u>

Dated: Monday, April 20, 2026

Ronald S. Gellert (DE 4259)
**GELLERT SEITZ BUSENKELL &
BROWN, LLC**
1201 North Orange Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 425-5806
Facsimile: (302) 425-5814

John E. Sebastian (admitted *pro hac vice*)
Brian C. Padove (admitted *pro hac vice*)
**WATT, TIEDER, HOFFAR &
FITZGERALD, L.L.P.**
10 South Wacker Drive, Suite 1100
Chicago, Illinois 60606
Telephone: 312.219.6922
Telephone: 312.219.6920

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................ 1

NATURE AND STAGE OF PROCEEDINGS ..................................................................... 3

SUMMARY OF ARGUMENT ............................................................................................ 4

FACTUAL BACKGROUND ............................................................................................... 5

LEGAL STANDARD........................................................................................................... 9

ARGUMENT ..................................................................................................................... 11

   A.   Preliminary Evidentiary Objections to the Noa Declaration And Genuine Issues of Fact Precluding Summary Judgment ...................................................................... 11

   B.   The Unanimity of the Board Votes Is Irrelevant Because There is a Genuine Issue of Material Fact as to Michael Ricci's Status As a Board Member .............................. 14

      1.   Atlantic's Appointees Disagreed As to Whether They Represented the Surety........... 15

   C.   Whether Atlantic Materially Breached the Sinking Fund Agreement Such That Its Termination of the Tolling Agreement was Ineffective is an Issue of Fact............................. 17

      1.   Whether the Parties Intended for the Operative Agreements to Render the General Indemnity Agreement Ineffective is an Issue of Fact ........................................................ 17

      2.   The Terms of the Operative Agreements are Ambiguous As to Atlantic's Ability to Terminate the Tolling Agreement................................................................................... 19

      3.   Whether a Material Breach of the Sinking Fund Agreement Rendered the Tolling Agreement Null and Void is a Question of Fact................................................................. 20

   D.   The Operative Agreements Contain Ambiguities That Preclude Summary Judgment .... 21

      1.   The Agreements' Conflicting Provisions Create Genuine Disputes of Material Fact.. 21

   E.   Lighthouse's Position That It Had No Duties Raises a Genuine Dispute as to Consideration 22

   F.   The Validity of Atlantic's Affirmative Defenses Present Genuine Disputes of Material Fact 23

CONCLUSION.................................................................................................................... 24

**TABLE OF AUTHORITIES**

**CASES**

**CASES**

*Am. Flint Glass Workers Union, AFL-CIO v. Beaumont Glass Co.*, 62 F.3d 574 (3d Cir. 1995) 10

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3d Cir. 1996) ............................................ 9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ..................................................... 10, 17

*Bradley v. Maryland Cas. Co.*, 563 F. Supp. 602 (D. Del. 1983) .................................................... 9

*Gans v. Mundy*, 762 F.2d 737, at 744 ....................................................................................... 10

*GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776 at 783 (Del. 2012)10, 19, 22

*Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300 (3d Cir. 1995) .............................. 9

*Ideal Dairy Farms, Inc. v. John Labatt, Lt*d., 90 F.3d 737 (3d Cir. 1996) ................................... 9

In re BlackRock Mut. Funds Advisory Fee Litig., 327 F. Supp. 3d 690 (D.N.J. 2018) ............... 12

*In re Combustion Eng'g, Inc.,* 366 F. Supp. 2d 224 (D. Del. 2005) .............................................. 18

*In re Orion Ref. Corp.*, 397 B.R. 245 (Bankr. D. Del. 2008) ...................................................... 10

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, (1986) ........................... 9

*Nathanson v. Med. College of Pennsylvania*, 926 F.2d 1368, 1380 (3d Cir. 1991 ...................... 10

*Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86 (3d Cir. 2008) ............................................ 20

*Origis USA LLC v. Great Am. Ins. Co.*, 345 A.3d 936 (Del. 2025) ............................................ 10

*Saienni v. G & C Capital Group, Inc.*, No. 96C–07–151, 1997 WL 363919, at *3 (Del.Super. May 1, 1997) ....................................................................................................................... 20

**RULES**

Fed.R.Civ.P. 56(c) .................................................................................................................. 1, 9

Rule 801(c) ........................................................................................................................... 11, 12

Rule 803(6) .............................................................................................................................. 12

Rule 901(b)(1) .......................................................................................................................... 11

Rule 902(11). ........................................................................................................................... 12

**TREATISES**

23 Richard A. Lord, *Williston on Contracts* § 63:3 (4th ed.1992) ............................................ 20

Defendant, Atlantic Specialty Insurance Company ("Atlantic"), by and through its undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby submits this response brief in opposition to Lighthouse Resources Inc.'s ("Lighthouse") Motion for Summary Judgment as to Liability (the "Motion") (Adv. D.I. 135), for the reasons set forth fully below.

## PRELIMINARY STATEMENT

Lighthouse's Motion for Summary Judgment as to Liability [Adv. D.I. 135] fails to establish that it is entitled to summary judgment on the issue of Atlantic's liability. Although the Court has denied Atlantic's Motion Pursuant to Rule 56(d) to Defer Consideration of Lighthouse's Motion for Summary Judgment, the denial of that motion does not eliminate the genuine disputes of material fact that pervade Lighthouse's Motion. There are numerous issues of material fact present sufficient to deny Lighthouse's Motion outright. Lighthouse asserts that disputed facts are undisputed and seeks to resolve contested factual issues as a matter of law. There are significant factual issues remaining in this litigation that preclude summary judgment.

For instance, Lighthouse makes much of the nature of Reclamation Trust Entity Board (the "Board") member Michael Ricci's position on the Board and whether he "represented" Atlantic. Lighthouse asserts that it is undisputed that Michael Ricci and his predecessor spoke for Atlantic and were Atlantic's representatives such that Mr. Ricci could bind Atlantic through his votes as a Board member. However, emails among Lighthouse, Atlantic, and Michael Ricci indicate that Ricci went against Atlantic's wishes and stated outright that he represented the best interests of the Trust and *not Atlantic*. There is, at minimum, a genuine issue of material fact as to Michael Ricci's ability to bind Atlantic to the yearly budget when he was merely appointed by, and did not represent, the various sureties, including Atlantic.

1

Other instances of genuine issues of material fact abound, namely, the issue of whether Atlantic has even breached the contract, and, even then, whether that breach is material presents a genuine dispute of material fact. Lighthouse also asserts that Atlantic's termination of the Tolling Agreement (as hereinafter defined) was ineffective, but that argument presents a factual issue as to the parties' intent in executing that agreement, whether Atlantic breached prior to terminating the Tolling Agreement, and, if so, whether that breach was material such that it voided the terms of the Tolling Agreement. Lighthouse further argues that Atlantic cannot rely on its General Indemnity Agreement ("GIA") with Lighthouse and its affiliates/other indemnitors because the GIA pre-dated the execution of the Operative Agreements (as defined herein). Whether the GIA is still in force, and whether Lighthouse breached the terms thereto, are factual issues that present genuine disputes of material fact precluding summary judgment.

Furthermore, the Operative Agreements contain provisions that conflict with one another, particularly regarding the continuing effect of the GIA, which the Bonding Agreement expressly preserved in Section 1.2 as "valid, effective and in full force and effect," and the forbearance obligations imposed on the Sureties under Sections 1.5 and 1.7 of the Bonding Agreement. These conflicting provisions create ambiguity as to the scope and conditions of Atlantic's obligations that cannot be resolved as a matter of law on the current record.

As a final matter, Lighthouse attempts to discredit Atlantic's affirmative defenses, ("Affirmative Defenses") despite never having moved to strike those affirmative defenses as improperly plead or legally insufficient. The Affirmative Defenses are valid and present genuine disputes of material fact, particularly those that relate to damages and unclean hands.

Lighthouse's Motion fails to rely upon any undisputed material facts that entitle it to summary judgment on Atlantic's liability and therefore Lighthouse's motion should be denied.[1]

### NATURE AND STAGE OF PROCEEDINGS

On December 3, 2020, Lighthouse and related entities filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On March 10, 2021, this Court confirmed the Second Amended Joint Plan of Debtors (the "Plan"). [D.I. 435]. On April 7, 2021, the parties executed the Operative Agreements, including the Trust Agreement, Sinking Fund Agreement, and Bonding Agreement.

On May 17, 2024, Lighthouse commenced this adversary proceeding alleging that Atlantic breached the Sinking Fund Agreement by failing to release its Pro Rata Share of collateral for the 2024 and 2025 funding years. [Adv. D.I. 1]. Atlantic answered and asserted eight Affirmative Defenses. [Adv. D.I. 122]. Atlantic's counterclaims were dismissed on July 1, 2025 [Adv. D.I. 98], and its Motion for Leave to Amend Counterclaim was denied on January 28, 2026. [Adv. D.I. 132-33].

On February 4, 2026, Lighthouse moved for summary judgment on liability. [Adv. D.I. 134-35]. Atlantic filed a Motion Pursuant to Rule 56(d) to Defer Consideration. [Adv. D.I. 148]. On April 14, 2026, the Court denied Atlantic's Rule 56(d) Motion. This is Atlantic's opposition to Lighthouse's Motion for Summary Judgment as to Liability.

In the meantime and as a show of good faith, Atlantic has filed a motion for leave to deposit funds and schedule a pretrial settlement conference [Adv. D.I. 169] requesting permission to

---

[1] It further must be noted that, although the Court denied Atlantic's Motion Pursuant to Rule 56(d) to Defer Consideration of Lighthouse's Motion for Summary Judgment as to Liability on April 14, 2026, Atlantic continues to maintain that genuine disputes of material fact preclude summary judgment.

deposit the collateral it holds with the Court and attempt to resolve this matter amicably with Lighthouse. Atlantic's motion remains pending.

**SUMMARY OF ARGUMENT**

1. Lighthouse's Motion should be denied because the exhibits upon which it relies — Board meeting minutes and email communications attached to the Noa Declaration — are inadmissible. Mr. Noa lacks personal knowledge to authenticate these documents under Rule 901(b)(1), and the documents constitute hearsay under Rule 801(c) for which no exception has been established. Without admissible evidence, Lighthouse cannot carry its burden of demonstrating the absence of genuine disputes of material fact.

2. There is a genuine dispute of material fact as to whether Michael Ricci, the surety-appointed Board member, had authority to bind Atlantic through his votes. The Trust Agreement provides only that the Sureties would "appoint" a Board member — not that the appointee would serve as an agent or representative of any surety. Mr. Ricci himself has stated that his vote was "as a board member, not as a representative of the sureties." Whether Ricci could bind Atlantic is a factual question that precludes summary judgment.

3. Whether Atlantic materially breached the Sinking Fund Agreement is a question of fact. Materiality of breach is "generally an issue of fact" under Delaware law, and this Court has not made any such finding to date.

4. The Operative Agreements are ambiguous as to the scope of Atlantic's discretion. Section 1.2 of the Bonding Agreement expressly preserves the GIA as "valid, effective and in full force and effect," while Sections 1.5 and 1.7 impose forbearance obligations that conflict with the GIA's grant of discretion. These conflicting provisions give rise to competing reasonable interpretations that cannot be resolved as a matter of law.

4

5. Lighthouse's own position — that it had no enforceable obligations under the Operative Agreements — raises a genuine dispute as to consideration. If Lighthouse bore no duties, it provided nothing in exchange for Atlantic's agreement to release millions of dollars in collateral, calling into question the enforceability of the very agreements Lighthouse seeks to enforce.

6. Lighthouse's Affirmative Defenses present genuine disputes of material fact. The liability-related defenses (1, 2, 3, 6, and 7) have not been adjudicated on the merits, and the damages-related defenses (4, 5, and 8) are outside the scope of Lighthouse's liability-only Motion.

## FACTUAL BACKGROUND

At this stage of the litigation and given the amount of briefs filed by the parties herein, it is Atlantic's belief that the Court is more than familiar with the facts and circumstances of the case. Notwithstanding, Atlantic recites the following facts for the purposes of defining the relevant agreements.

### A. The Agreements

*i. The Bonds and General Indemnity Agreement*

Atlantic, as surety, issued reclamation bond nos. 800034462 and 800010582, each with a penal sum of $15,000,000.00, on behalf of Decker Coal Company, LLC as principal and guaranteeing Decker Coal's performance obligations under federal and local laws (the "Bonds"). *See* Atlantic's Answer and Affirmative Defenses to First Amended Complaint, [Adv. D.I. 122] (the "Responsive Pleading") at p. 36, ¶ 1. In consideration for extending such credit through issuance of the Bonds, Lighthouse and, among others, non-bankrupt entity, Black Butte Coal Company ("Black Butte"), entered into a pre-petition General Indemnity Agreement (the "GIA") with Atlantic. *Id*. at p. 34, ¶ 2.

5

The GIA[2] explicitly mandated that Atlantic "shall not have any obligation to release []
collateral until it has received a written release and conclusive evidence of its discharge without
loss in the form and substance satisfactory to [Atlantic] with respect to the Bond and fulfillment
by Indemnitors of all obligations under this Agreement." *See* **Ex. A** at ¶ 3.

Moreover, the GIA further requires the Indemnitors to post collateral upon Atlantic's
request and for the Indemnitors to exonerate, hold harmless, indemnify and keep indemnified
Atlantic from and against any and all liability for losses, fees, costs and expenses of any kind,
including attorneys' fees, if Atlantic sustains or incurs a loss arising out of, directly or indirectly,
issuing the Bonds, the Indemnitors' failure to comply with any terms of the GIA, or Atlantic
enforcing the terms and conditions of the GIA. *See* **Ex. A** at ¶¶ 2-3.

*ii. The Bankruptcy Filing, The Plan, and The Operative Agreements*

On or about December 3, 2020, Decker Coal and Lighthouse, among others, filed voluntary
petitions for relief under Chapter 11 of the Bankruptcy Code in this Court. *See* [D.I. 1]. On or
about March 10, 2021, Lighthouse filed its second amended joint plan of debtors under Chapter
11 of the Bankruptcy Code (the "Plan") which this Court confirmed on March 10, 2021. [D.I. 435].

Pursuant to the Plan and on the effective date of April 7, 2021, Lighthouse and, among
others, Atlantic executed the Reclamation Trust Entity and Distribution Agreement ("Trust
Agreement"), which created the Reclamation Trust "for the primary purpose of supervising the
Reclamation Plans" that would presumably result in the reclamation of the East Decker mine. *See*
**Ex. B** at §1.1.

---

[2] Unless otherwise noted herein, citations to "Exhibit" or "Ex." shall refer to the exhibits attached
to the Declaration of John E. Sebastian, filed contemporaneously with this opposition.

Lighthouse was appointed to serve as the Reclamation Trust Entity Representative in accordance with the terms of the Plan and the other Operative Agreements between Lighthouse and Atlantic, including but not limited to the Plan, Plan Supplements, the Trust Agreement, the Reclamation Sinking Fund Agreement ("Sinking Fund Agreement") [**Ex. C**], and the Reclamation Trust Entity Bonding Agreement ("Bonding Agreement") [**Ex. D**]. *See* **Ex. B** at § 1.1.

In addition to the Trust Agreement, Atlantic and Lighthouse entered into the Sinking Fund Agreement on April 7, 2021. *See* Responsive Pleading at p. 41, ¶ 20. The Sinking Fund Agreement establishes a segregated account under the custody and control of Lighthouse and on behalf of the Reorganized Coal Side Debtors (as defined in the Plan and Trust Agreement) to fund Lighthouse's reclamation obligations. *See* **Ex. C**, at p. 1. The Sinking Fund Agreement (in conjunction with the Trust Agreement) further provides that the Reclamation Sinking Fund is to be funded by at least two sources: (1) releases of collateral held by the sureties; and (2) a portion of profits from Black Butte. *See* **Ex. C** at § 2.2, 2.3; *See* **Ex. B** at § 6.3.

In addition to the foregoing, Lighthouse alleges throughout its Amended Complaint that Atlantic (and other sureties) have a "representative" on the Reclamation Trust Entity Board pursuant to the Trust Agreement. This is not a factual assertion. The Trust Agreement only provides that the sureties, including Atlantic, would *appoint* a member to the Board. *See* **Ex. B** at § 3.1. The surety-appointed board member is not a surety representative and is not a representative of Atlantic – any other statements to the contrary are not based in fact. *Id*. In other words, nowhere in the Trust Agreement does it provide that the surety-appointed board member is an agent of and/or authorized to act on behalf of Atlantic. *Id*. In fact, the current surety-appointed member has expressly stated that at least one of his decisions relating to approval of budgets for the Trust has gone against the wishes of one of the sureties - Atlantic. *See* **Ex. F**. This is noteworthy because

the parties included a provision expressly requiring the surety-appointed member's "consent" for, among other things, budget approval. *See* **Ex. B** at ¶¶ 3.3(q) and (m).

Finally, and also on April 7, 2021, and in relation to the GIA, Atlantic and Lighthouse entered into the Bonding Agreement which provided, in relevant part, that Lighthouse had assumed the GIA and that the provisions of the same are all valid, effective, and in full force and effect. *See* **Ex. D** at ¶ 1.2. The Bonding Agreement further incorporates the Plan which mandates that Lighthouse oversee the completion of the reclamation of the Decker mines. *See* **Ex. D** at § 5.4; *See also* Plan at Art. IV.B.2. The Bonding Agreement included a certain tolling agreement ("Tolling Agreement") entered into between the sureties and non-party non-debtor Black Butte Coal Company ("Black Butte"), effective as of December 3, 2020. [Adv. D.I. 136-27]; *See* **Ex. E**. The purpose of the Tolling Agreement was, generally, to toll the applicable limitations period for indemnification claims that the sureties could pursue against Black Butte. *See* **Ex. E** at Recitals.

Following execution of the foregoing agreements and filing of the Plan, on August 31, 2021, as part of a Plan Supplement, Lighthouse filed its Proposed Reclamation Trust Entity Budget (the "Initial Budget"). *See* Responsive Pleading at p. 40 ¶¶16-17 and Initial Budget [D.I. 629-10]. Relevant to Atlantic is the East Decker Mines budget wherein it is represented that Atlantic will have paid out all of its collateral by year four and be fully released from its Bonds by 2025. *See* Responsive Pleading at p. 40, ¶ 17. The Initial Budget also sets forth that the "Sinking Fund Contribution to Decker" would total $114,591,000.00, with such amount to be funded over ten years by Atlantic and other sureties, as well as Black Butte through the Reclamation Sinking Fund. *Id*. at ¶ 18. The Plan, Trust Agreement, Sinking Fund Agreement, Bonding Agreement, Tolling Agreement, Initial Budget, and GIA are collectively referred to and defined herein as the "Operative Agreements".

8

The Trust Agreement expressly provides, among other things, that Lighthouse shall supervise the reclamation plans and in that process will, *inter alia*, implement the Plan, oversee the completion of the Decker reclamation plan, and oversee the Reclamation Sinking Fund with use of such funds subject to the supervision of the sureties. *See* **Ex. B** at §1.1. Atlantic disputes Lighthouse's characterization that its role under the Operative Agreements was limited to general supervision.

## LEGAL STANDARD

Summary judgment should be granted only if a court concludes that there are "no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Importantly, "[t]he moving party bears the burden of proving that no genuine issue of material fact is in dispute." *Ideal Dairy Farms, Inc. v. John Labatt, Lt*d., 90 F.3d 737, 743 (3d Cir. 1996) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 n. 10 (1986)); *Aman v. Cort Furniture Rental Corp*., 85 F.3d 1074, 1080 (3d Cir. 1996) ("We have held repeatedly that the party moving for summary judgment under Fed.R.Civ.P. 56(c) bears the burden of demonstrating the absence of any genuine issues of material fact."). Facts are material where they could alter the outcome, and disputes are genuine where there exists evidence "'from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct.'" *Ideal Dairy Farms, Inc*., 90 F.3d at 743-44 (quoting *Horowitz v. Federal Kemper Life Assurance Co*., 57 F.3d 300, 302 N. 1 (3d Cir. 1995)); *see also Bradley v. Maryland Cas. Co*., 563 F. Supp. 602, 605 (D. Del. 1983) ("Summary judgment may not be granted where there is the slightest doubt as to the facts . . . Thus, the moving party in a summary judgment motion has a substantial burden to meet.") (internal citation omitted).

9

"In ruling on a motion for summary judgment, 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor.'" *In re Orion Ref. Corp.*, 397 B.R. 245, 252 (Bankr. D. Del. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Further, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] ruling on a motion for summary judgment []." *Anderson*, 477 U.S. at 255.

Additionally, while the issue of whether a contract is unambiguous may be a question of law for the court to decide, *Origis USA LLC v. Great Am. Ins. Co.*, 345 A.3d 936, 951 (Del. 2025), if the contract is ambiguous such that reasonable minds could differ as to the meaning, the parties' intent is the factual issue and the court may rely on extrinsic evidence to divine intent. *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776 at 783 (Del. 2012); *see also Am. Flint Glass Workers Union, AFL-CIO v. Beaumont Glass Co.*, 62 F.3d 574, 581, n.8 (3d Cir. 1995)(noting that an "issue of fact concerning the intent of the contracting parties should be distinguished from the legal issue of construing the meaning of a contract's terms from their text").

Furthermore, where facts are undisputed, "[s]ummary judgment may not be granted if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Med. College of Pennsylvania*, 926 F.2d 1368, 1380 (3d Cir. 1991) (citing *Gans v. Mundy*, 762 F.2d 737, 744 (3d Cir. 1985)); *see also Ideal Dairy Farms, Inc.*, 90 F.3d at 744 ("Finding three possible constructions of the facts suggests that there is a genuine issue of material fact about which a jury could reasonably disagree. The court's finding of factual ambiguity should have ensured that the contract claim proceed to trial.").

10

**ARGUMENT**

A. **PRELIMINARY EVIDENTIARY OBJECTIONS TO THE NOA DECLARATION AND GENUINE ISSUES OF FACT PRECLUDING SUMMARY JUDGMENT**

As a threshold matter, Atlantic objects to Lighthouse's reliance on certain exhibits attached to the Declaration of Jesse L. Noa [Adv. D.I. 136] (the "Noa Declaration"). Even under the relaxed post-2010 amendments to Rule 56, unauthenticated documents submitted in support of summary judgment are "grounds for objection, in which case the proponent has the burden to show that the material is admissible as presented or to explain the admissible form that is anticipated." *In re LTC Holdings, Inc.*, 596 B.R. 797, 802 (Bankr. D. Del. 2019) (quoting Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment). In *LTC Holdings*, this Court found that even a claims director who had been working a debtor's file for two years could not authenticate documents where he lacked personal knowledge of their creation. *Id*. at 804–05. The same principle applies here with greater force: Mr. Noa is outside litigation counsel for Lighthouse at Potter Anderson & Corroon LLP. He has no personal knowledge of the underlying facts of this case, did not attend the Board meetings, was not a party to the email communications, and did not prepare the Board meeting minutes upon which Lighthouse relies. Lighthouse has the burden to demonstrate admissibility once Atlantic objects, and the Noa Declaration cannot carry it.

Atlantic specifically objects to the Board meeting minutes attached as Exhibits 22 and 23 to the Noa Declaration on two independent grounds. First, Mr. Noa cannot authenticate these documents under Rule 901(b)(1) because he was not present at the meetings, did not prepare the minutes, and is not a records custodian of the Reclamation Trust Entity. The proper authenticating witness would be the individual who prepared the minutes or a custodian with knowledge of the Trust's record-keeping practices. No such testimony or certification has been offered. Second, and independently, the minutes are inadmissible hearsay under Rule 801(c). Lighthouse offers the

11

minutes for the truth of the matters asserted therein - specifically, that the Board "unanimously approved" the annual budgets and that Michael Ricci voted in favor of those budgets. These are out-of-court statements offered to prove the foundational predicate of Lighthouse's breach theory: that the budgets were approved, that approval bound Atlantic, and that Atlantic's failure to pay its Pro Rata Share thereafter constituted a breach. To the extent Lighthouse contends the minutes qualify as business records under Rule 803(6), that exception requires testimony from "the custodian or another qualified witness" or certification under Rule 902(11). Mr. Noa, as outside litigation counsel, can satisfy neither requirement. Without admissible evidence that the budgets were approved, Lighthouse cannot establish the first link in its chain of liability under Section 2.3 of the Sinking Fund Agreement.

Atlantic likewise objects to the communications attached to the Noa Declaration as Exhibits 4-20. These communications are offered for the truth of the matters asserted - that Mr. Ricci served as Atlantic's "representative" and that his votes bound Atlantic - and are hearsay under Rule 801(c). Lighthouse has not established (or even attempted to establish) any exception, and Mr. Noa's declaration is insufficient to lay the foundation required by Rule 803(6).

Moreover, Lighthouse may not cure these deficiencies on reply. New evidence and arguments raised for the first time in a reply brief are waived. *See In re BlackRock Mutual Funds Advisory Fee Litigation*, 327 F.Supp.3d 690, 736, n. 42 (D. N.J. 2018) (noting that Courts decline to consider new issues and present new factual materials in a reply brief that should have been raised in initial briefs). Thus, should Lighthouse attempt to rely on evidence not cited in its opening brief – including, among other things, any discovery-related materials - to establish facts that its current submissions fail to support, such evidence should be disregarded. *Id*.; *see also Laboratory Skin Care, Inc. v. Limited Brands, Inc.*, 757 F.Supp.2d 431, 438-39 (court addressing situation

12

where party attempts to rely on documents identified for the first time in reply brief, and finding that such reliance is improper).

Notwithstanding the foregoing evidentiary objections, and without waiving the same, Atlantic addresses below the substantive arguments raised in Lighthouse's Motion.

First, Lighthouse's argument that Section 2.3 of the Sinking Fund Agreement requires Atlantic to release its Pro Rata Share of the collateral it is holding relies entirely on one disputed factual premise: that Michael Ricci, the member of the Board appointed by the sureties, was Atlantic's representative, spoke for Atlantic, and thus could bind Atlantic through his vote. However, the evidence in the case thus far shows that this fact is genuinely disputed. Michael Ricci himself has stated in an email to parties involved in this litigation that his vote was governed by what he viewed as being in the best of interests of the Trust and not merely in the best interests of the sureties. He further stated that Atlantic did not control how he voted.  In fact, Atlantic has not consented to a budget since this litigation was filed.

Second, Lighthouse argues that Atlantic's termination of the Tolling Agreement was "ineffective" because Atlantic had already allegedly breached the Sinking Fund Agreement. Whether Atlantic had breached the Sinking Fund Agreement prior to its termination of the Tolling Agreement is a genuine question of fact. Atlantic's ability to terminate the Tolling Agreement under the circumstances presented in this case is a factual question that the existing record does not resolve in Lighthouse's favor. In order to resolve these questions, the most important fact is the interplay between the GIA and the Tolling Agreement, and what effects those contracts had on each other. In Lighthouse's telling, the GIA effectively became null and void upon execution of the Operative Agreements. Atlantic submits that this is not at all what the parties intended when they struck their bargain.

13

Furthermore, the GIA, Tolling Agreement, and Bonding Agreement read together bring into question whether the GIA really permits Atlantic, as surety, to exercise its discretion. If the GIA can be plausibly read to permit Atlantic discretion, but other Operative Agreements purport to deny Atlantic any discretion, then the contracts conflict and are ambiguous. That ambiguity also precludes summary judgment. Whether a party breached a contract and whether that breach is material is a question of fact, and those facts are disputed.

Third, Lighthouse argues that each of Atlantic's Affirmative Defenses are without merit and have effectively already been decided by this Court. That is not the case and ignores that the facts material to those defenses remain genuinely disputed, particularly those related to damages. Lighthouse seeks to bootstrap this Court's ruling on the unrelated Motion for Leave to Amend Counterclaim as a ruling on Atlantic's Affirmative Defenses. This ignores that Lighthouse has (1) not moved to strike Atlantic's Affirmative Defenses; (2) argued, in the context of a Motion for Summary Judgment as to *liability* only, that this Court should still reject Affirmative Defenses 4, 5, and 8, which relate solely to damages; and (3) cited no undisputed material facts to support its conclusions. In sum, Lighthouse seeks to foreclose Atlantic's Affirmative Defenses that relate to damages in a Motion that explicitly disclaims it is seeking damages. Lighthouse can cite no undisputed material facts entitling it to summary judgment on all eight (8) of Atlantic's Affirmative Defenses.

For the reasons stated below, Lighthouse's Motion should be denied.

### B. THE UNANIMITY OF THE BOARD VOTES IS IRRELEVANT BECAUSE THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO MICHAEL RICCI'S STATUS AS A BOARD MEMBER

Lighthouse argues that Michael Ricci can be categorically considered Atlantic's "representative" on the Board such that he spoke for Atlantic for essentially two reasons. First, Michael Ricci's predecessor stated in his resignation letter that he was resigning as "Atlantic's

Representative". Second, Lighthouse clings to the mere fact that one of Atlantic's internal representatives requested that Ricci be paid, and therefore Atlantic controlled him and he spoke for Atlantic. Neither of these facts are undisputed, particularly in light of a certain May 1, 2025 email from Mr. Ricci to other members of the Board.

## 1. **Atlantic's Appointees Disagreed As to Whether They Represented the Surety**

In support of its argument that Michael Ricci represented and spoke for Atlantic, Lighthouse cites the resignation letter of Danny Hall, wherein he stated that he "…hereby submits my resignation as the Sureties representative Lighthouse Reclamation Trust Entity Board.") [sic] *See* Exhibit 4 to Lighthouse's Memo in Support of Motion for Summary Judgment. [Adv. D.I. 136-4]. Lighthouse digs itself deeper, stating that "Communications produced in discovery - including communications produced *by Atlantic* - demonstrate that all parties, including Atlantic, understood that the surety representative on the Board acted on behalf of the sureties, including Atlantic." *See* [Adv. D.I. 135 at p 5; at n.5 p. 16.].

That Lighthouse relegates the core dispute on this issue – whether Atlantic could be bound by the votes of the Board member it appointed – to a footnote is telling. Lighthouse seeks to ignore that its argument relies on Michael Ricci's status because if Michael Ricci's vote did not bind Atlantic, Atlantic could not be bound by any board vote or budget. This includes whether Atlantic can be bound by the actions of the other sureties.

In an effort to get around the dispute as to Ricci's status as a Board member, Lighthouse cites emails and documents that it argues puts Michael Ricci's status as a surety representative beyond dispute. However, there is a genuine dispute as to this fact and Lighthouse's argument is unsustainable. As a threshold matter, the Trust Agreement itself undermines Lighthouse's characterization. Section 3.1 of the Trust Agreement provides only that the sureties would

15

"appoint" a member to the Board. *See* **Ex. B** at § 3.1. Nowhere does the Trust Agreement provide that the surety-appointed board member is an agent of, authorized to act on behalf of, or a representative of Atlantic or any individual surety. The power to appoint is not the power to control, and appointment to a board does not create an agency relationship as a matter of law.

Most notably, Michael Ricci stated in the aforementioned May 1, 2025 email as follows: "Clearly, Intact [Atlantic] and Zurich have different positions on the plan that will be presented today. After [Lighthouse CEO] Tay's presentation of the plan, I will vote what I believe is in the best interest of the trust. I will be voting against the wishes of one of the sureties. I will make clear that my vote is as a board member, *not as a representative of the sureties*; and that is contrary to at least one of the sureties." *See* **Ex. F** at p. 1. This email was sent well into the current adversary proceeding and is a key piece of evidence in this case.

Michael Ricci clearly stated in his May 1, 2025 email that he was voting against the wishes of Atlantic, that his vote was as a Board member and his vote would be what he believed to be "in the best interest of the trust," and that his vote was not as a representative of Atlantic. *Id*. Nor could it be; Ricci's vote went directly against the interests and position of Atlantic. It is thus disputed by the board member himself whether Atlantic controlled or was represented by Michael Ricci. He surely could not have represented a party whose wishes he ignored. There is a genuine dispute regarding the material fact as to whether or not Michael Ricci could bind Atlantic through his votes on the Board. *See e.g., Lang v. Morant*, 867 A.2d 182 (Del. 2005) (stating that whether someone was the agent for another is a factual question for the jury); *Billops v. Magness Const. Co.*, 391 A.2d 196 (Del. 1978) (Delaware court referencing that questions of apparent authority are questions of fact for the jury to determine). Moreover, this calls into question the interplay between the Operative Agreements and intent of the parties as it relates to the express Trust Agreement's

16

provision requiring the surety-appointed member's consent for, *inter alia*, budget approval. *See* **Ex. B** at §§ 3.3(q) and (m).

An issue of fact is "genuine" only if there is evidence from which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. at 249 (1986). In this case, whether Michael Ricci was an agent and representative of Atlantic is genuinely disputed: a jury could find that he was not an agent of Atlantic based on the fact that he voted against Atlantic's interests. At this point in the litigation, the record is not conclusive on this score[3], thus precluding summary judgment because the issue of whether Michael Ricci's vote as a Board member could bind Atlantic such that Atlantic was *required* to release its pro rata share upon approval of the budget is a material fact that is genuinely disputed.

### C. WHETHER ATLANTIC MATERIALLY BREACHED THE SINKING FUND AGREEMENT SUCH THAT ITS TERMINATION OF THE TOLLING AGREEMENT WAS INEFFECTIVE IS AN ISSUE OF FACT

#### 1. Whether the Parties Intended for the Operative Agreements to Render the General Indemnity Agreement Ineffective is an Issue of Fact

Much about what the parties intended when negotiating the Operative Agreements remains unresolved, most importantly, the continuing effect of the GIA entered into between Lighthouse and Atlantic upon Atlantic's issuance of the reclamation bonds. The issue of whether or not the GIA has been entirely extinguished is presented by Lighthouse for the first time in its Motion for Summary Judgment. The record contains insufficient evidence of what the parties intended when negotiating the Operative Agreements, and thus, any dispute regarding those facts is genuine at this stage of the litigation. Critically, Section 1.2 of the Bonding Agreement expressly provides

---

[3] The Declaration of Brian C. Padove ("Declaration"), previously filed in support of Atlantic's Rule 56(d) Motion [Adv. D.I. 148-1] is attached to the Declaration of John Sebastian as **Exhibit G**. The Declaration identifies the genuine disputes of material fact that remain unresolved in this litigation by Atlantic.

that the Existing Indemnity Agreements, including the GIA, "remain valid, effective and in full force and effect" and are "hereby ratified and affirmed." See **Ex. D** at § 1.2. Section 1.2 further provides that if any provision of the Bonding Agreement is found to be inconsistent with a provision of the Existing Indemnity Agreements, "the provisions of the Existing Indemnity Agreements shall control." *Id*. Lighthouse's assertion that the GIA has been rendered entirely ineffective is therefore contradicted by the plain language of the very agreements upon which it relies.

"Both parties agree as follows: Section 3 of the General Indemnity Agreement provides that upon demand by any surety, any indemnitor (including Lighthouse), shall 'deliver to the Surety collateral in the form and amounts acceptable to the Surety in its sole and absolute discretion[.]'" [Adv. D.I. 135] at p. 8 (citing GIA at § 3). Lighthouse makes a puzzling assertion in its Motion that must be addressed: namely, that the GIA is entirely ineffective because it predates the Operative Agreements; *see* [Adv. D.I. 135] at p. 9. This assertion is an overreading of the Court's previous rulings, as no provisions of *any* of the Operative Agreements outright extinguish the terms of the GIA. The Court should hesitate to agree with Lighthouse, as Courts "should avoid interpreting contractual language in such a way as to render any term of the contract meaningless or superfluous." *In re Combustion Eng'g, Inc.,* 366 F. Supp. 2d 224, 231 (D. Del. 2005).

Additionally, section 3 of the GIA reads in a way that appears to give Atlantic discretion to demand collateral from Lighthouse. However, Lighthouse has argued that the terms of the remaining Operative Agreements function to diminish Atlantic's discretion to demand collateral from Lighthouse. As it stands and how Lighthouse would prefer, there is no scenario in which Atlantic could demand collateral from Lighthouse. This cannot be the case. At a minimum, the

18

intent of the parties who negotiated the Operative Agreements regarding the continuing effect of the GIA presents a genuine dispute of material fact, as granting summary judgment to Lighthouse would render the GIA meaningless.

### 2. **The Terms of the Operative Agreements are Ambiguous As to Atlantic's Ability to Terminate the Tolling Agreement.**

Atlantic disputes that it breached any of the Operative Agreements such that all of its rights under the Tolling Agreement were entirely extinguished. At a minimum, the terms highlighted by Lighthouse in support of its argument are ambiguous as to what circumstances allow for Atlantic to terminate the Tolling Agreement. As Lighthouse sees it, Atlantic could never terminate the Tolling Agreement. Atlantic sees it differently, and these two plausible, competing interpretations render the meaning of the cited provision ambiguous. *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012).

The Bonding Agreement states that Atlantic must "forbear any [] rights under the [] Indemnity Agreement" unless in the surety's "reasonable good faith discretion" Lighthouse has committed a "material default, including either an actual or anticipatory default under the Plan or other Definitive Documents[.] *See* **Ex. D** at §§ 1.3, 1.5. Lighthouse conveniently ignores the "reasonable good faith discretion" portion of the language and merely states that it never defaulted. But Atlantic submits that all that is required of Atlantic is that it use its *discretion* to determine whether or not Lighthouse will default, not whether Lighthouse *is, in fact,* in default. Moreover, Lighthouse overlooks that the forbearance obligation in Section 1.5 runs to "the Sureties" collectively, raising the additional question of whether any individual surety may act unilaterally or whether a collective determination is required. This further ambiguity in the Operative Agreements precludes summary judgment. Additionally, Section 1.7 of the Bonding Agreement limits the collateral securing the Reorganized Coal Side Debtors' obligations to that "governed by

19

the Reclamation Sinking Fund Agreement," and provides that the Sureties will "forbear from requiring the Reorganized Coal Side Debtors to assign, transfer or set over to the Sureties any additional collateral." *See* **Ex. D** at § 1.7. The interplay between this limitation and the GIA's grant of unfettered discretion to demand collateral under Section 3 of the GIA creates a direct conflict between the agreements that cannot be resolved as a matter of law on this record. At a minimum, the provisions Lighthouse seeks to rely on are ambiguous as to how much discretion Atlantic has under the Operative Agreements, and this ambiguity precludes summary judgment.

### 3. Whether a Material Breach of the Sinking Fund Agreement Rendered the Tolling Agreement Null and Void is a Question of Fact

Lighthouse again overreads this Court's previous rulings and effectively argues in its Motion that the denial of Atlantic's Motion for Leave to Amend is tantamount to a finding that Atlantic materially breached the Sinking Fund Agreement. The Court has not ruled as such to date and there remain genuine disputes of material fact in the litigation. *See generally*, **Ex. G**. Furthermore, Lighthouse ignores well established contract law principles when it makes this broad assertion.

"Whether the breach of a contract is material is generally an issue of fact." *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 92 (3d Cir. 2008)(*citing Saienni v. G & C Capital Group, Inc.*, No. 96C–07–151, 1997 WL 363919, at *3 (Del.Super. May 1, 1997)) and 23 Richard A. Lord, *Williston on Contracts* § 63:3 (4th ed.1992)). Additionally, even setting aside that breach of one of the agreements is a factual issue, whether the breach of one agreement is a breach of each and every other agreement is also a factual issue that requires investigation of the parties' state of mind and intent when negotiating the Operative Agreements.

20

D. **THE OPERATIVE AGREEMENTS CONTAIN AMBIGUITIES THAT PRECLUDE SUMMARY JUDGMENT**

1. **The Agreements' Conflicting Provisions Create Genuine Disputes of Material Fact**

Atlantic respectfully recognizes this Court's prior rulings regarding the scope of Lighthouse's obligations under the Operative Agreements. Atlantic does not seek to relitigate those rulings here. However, the Court's prior holdings do not resolve the distinct question presented on summary judgment: whether the Operative Agreements, read together, are ambiguous as to the scope and conditions of Atlantic's obligation to release collateral. As set forth in Section B above, the GIA, the Bonding Agreement, and the Sinking Fund Agreement contain provisions that are in tension with one another - particularly regarding whether Atlantic retains any discretion under the GIA (which the Bonding Agreement expressly preserved in Section 1.2), and whether the forbearance provisions of Sections 1.3, 1.5, and 1.7 of the Bonding Agreement limit or expand Atlantic's rights. These conflicts cannot be resolved as a matter of law on the current record. Lighthouse says the following in its Motion:

> There are no provisions allowing for withholding of funds after approval for any reason.
>
> …
>
> The Sinking Fund Agreement imposes no obligations on Lighthouse that Atlantic may enforce. Indeed, the Sinking Fund Agreement imposes nothing other than general supervisory obligations on Lighthouse. See Ex. 1, 13:1-6. As with the Reclamation Trust Agreement, provisions allowing for withholding of funds or requiring that certain progress benchmarks be hit with the East Decker reclamation before the sureties release collateral. [sic] See id. at 13:7-13. And again, nothing in the Sinking Fund Agreement obligates Lighthouse to secure funding from Black Butte. *See id.*

*See* [Adv. D.I. 135] at p. 7, 8. Lighthouse's characterization of its obligations underscores the ambiguity in the Operative Agreements. While the Court has held that the agreements do not condition collateral release on Lighthouse meeting specific performance milestones, the question

21

of what the agreements do require  - and how the GIA, the Bonding Agreement, and the Sinking Fund Agreement interact - remains genuinely disputed. As set forth above, Section 1.2 of the Bonding Agreement expressly preserves the GIA as "valid, effective and in full force and effect," while Sections 1.5 and 1.7 impose forbearance obligations on the Sureties that appear to conflict with the GIA's grant of discretion. These competing provisions give rise to at least two plausible interpretations of Atlantic's obligations, and where two reasonable interpretations exist, the contract is ambiguous and summary judgment is inappropriate. See *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776 at 783 (Del. 2012). The ambiguity of the Operative Agreements as a whole precludes summary judgment on Atlantic's liability.

In sum, Lighthouse's Motion asks this Court to resolve contractual ambiguities in its favor as a matter of law. But where, as here, the Operative Agreements contain conflicting provisions that give rise to competing reasonable interpretations, summary judgment is inappropriate and the Motion should be denied.

E. **LIGHTHOUSE'S POSITION THAT IT HAD NO DUTIES RAISES A GENUINE DISPUTE AS TO CONSIDERATION**

Lighthouse's own characterization of the Operative Agreements creates an additional genuine dispute of material fact. In its Motion, Lighthouse expressly argues that the Sinking Fund Agreement "imposes no obligations on Lighthouse that Atlantic may enforce" and that Lighthouse had nothing more than "general supervisory obligations." [Adv. D.I. 135] at p. 7-8. Lighthouse further asserts that nothing in the agreements requires it to secure funding from Black Butte, meet any benchmarks, or make any progress toward reclamation before demanding that Atlantic release collateral. *Id*. Atlantic does not ask this Court to rewrite the agreements or imply terms the parties did not include. But Lighthouse's position, taken at face value, raises a fundamental question: if Lighthouse truly had no obligations whatsoever under the Operative Agreements, then what

22

consideration did Lighthouse provide in exchange for Atlantic's agreement to release millions of dollars in collateral?

It is a fundamental tenet of contract law that a valid contract requires consideration. *Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 573 (D. Del. 1993). If the Court accepts Lighthouse's characterization that it bore no duties, then Lighthouse received all the benefit of the bargain (the release of Atlantic's collateral to fund reclamation) while providing nothing in return. This is not Atlantic's reading of the agreements; it is the logical consequence of Lighthouse's own position. At a minimum, the tension between Lighthouse's assertion that it had no obligations and the existence of a confirmed Plan that contemplated mutual performance creates a genuine dispute of material fact regarding the enforceability of the very agreements upon which Lighthouse relies. Summary judgment is inappropriate where, as here, the movant's own theory of the case calls into question the validity of the agreements it seeks to enforce.

F.  **THE VALIDITY OF ATLANTIC'S AFFIRMATIVE DEFENSES PRESENT GENUINE DISPUTES OF MATERIAL FACT**

Lighthouse seeks summary judgment on all eight of Atlantic's Affirmative Defenses, yet has never moved to strike any of them as improperly pled or legally insufficient. The Affirmative Defenses fall into two categories: those relating to liability (Defenses 1, 2, 3, 6, and 7) and those relating to damages (Defenses 4, 5, and 8). Each category presents genuine disputes of material fact that preclude summary judgment.

As to the liability-related defenses, Lighthouse's argument rests on the premise that this Court's denial of Atlantic's Motion for Leave to Amend Counterclaim effectively resolved Atlantic's Affirmative Defenses. It did not. Affirmative defenses stand in a different procedural posture than counterclaims, and the Court has made no findings on the merits of Defenses 1, 2, 3, 6, or 7. Atlantic's Third Affirmative Defense of unclean hands is particularly inappropriate for

23

resolution at summary judgment. "Summary judgment is rarely proper in cases raising the defense of 'unclean hands' because '[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith, and other subjective feelings play dominant roles.'" *Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 577 (D. Del. 1993)(citing *DeLong Corp. v. Raymond Inern., Inc.*, 622 F.2d 1135, 1146 (3d Cir. 1980)). Moreover, Lighthouse attacks only the fraud element of unclean hands while failing to address the remaining elements of "deceit, unconscionability, or bad faith." *Allergan Hldgs. Unlimited Co. v. MSN Labs. Private Ltd.*, Civil Action No. 23-794-RGA, 2024 WL 3444368, at *4 (D. Del. July 17, 2024). As to the Sixth Affirmative Defense, whether Lighthouse can be bound by the Tolling Agreement is a quintessential factual question. *See Eagle Force Holdings, LLC v. Campbell*, 235 A.3d 727, 735 (Del. 2020) ("[w]hether a party manifested intent to be bound is a question of fact."). Summary judgment on the liability-related defenses should be denied.

As to the damages-related defenses, Lighthouse's Motion is self-defeating. Lighthouse has expressly moved for summary judgment on liability only, asking this Court to "set trial for the remaining damages caused by Atlantic's breaches." [Adv. D.I. 136] at p. 2. Yet, Lighthouse simultaneously asks this Court to foreclose Defenses 4, 5, and 8, each of which relates solely to the existence and measure of Lighthouse's damages. Lighthouse cannot disclaim that it is seeking damages in one breath and ask the Court to eliminate damages defenses in the next. These defenses should be preserved for the damages phase of this litigation.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Atlantic Specialty Insurance Company requests that this court deny Lighthouse's Motion for Summary Judgment as to Liability and for any further relief that this Court deems right and just.

Dated: April 20, 2026

/s/ Ronald S. Gellert
Ronald S. Gellert (DE 4259)
**GELLERT SEITZ BUSENKELL &
BROWN, LLC**
1201 North Orange Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 425-5806
Facsimile: (302) 425-5814

John E. Sebastian (admitted *pro hac vice*)
Brian C. Padove (admitted *pro hac vice*)
**WATT, TIEDER, HOFFAR &
FITZGERALD, L.L.P.**
10 South Wacker Drive, Suite 1100
Chicago, Illinois 60606
Telephone: (312) 219-6900

21071666.1 103953.00009